# IN THE COURT OF APPEALS OF IOWA

No. 17-1642
Filed August 15, 2018

**JAMES LEE LEIRAN,**
      Plaintiff-Appellant,

**vs.**

**JEANEEN LYNNE KLEPPE,**
      Defendant-Appellee.
_____

Appeal from the Iowa District Court for Allamakee County, Margaret L. Lingreen, Judge.

The father appeals from the district court's denial of his petition to modify physical care of his three children. **AFFIRMED.**

Mark B. Anderson, Cresco, for appellant.

Jeaneen Lynne Kleppe, Monona, appellee, pro se.

Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

James Leiran appeals the district court's denial of his petition to modify the physical-care determination regarding the three children he shares with Jeaneen Kleppe. The district court found James established a material and substantial change in circumstances since the entry of the original decree but determined he had failed to establish that he could provide the children with care superior to that provided by Jeaneen.

**I. Background Facts and Proceedings.**

James and Jeaneen are the never-married parents of three children, who were born in 2009, 2011, and 2013. James and Jeaneen were in a relationship from 2008 until July 2014, and the original custody decree was entered in September 2015.

In the decree, the court found that a physical altercation had taken place between James and Jeaneen in August 2013, in which James assaulted Jeaneen. The court noted, "James has a controlling and abusive personality. He has a history of prior abuse with his ex-wife that continued in his relationship with Jeaneen." Additionally, the court was "disturbed" by James's behavior of—while a no-contact order was in place—going to a nearby town to locate Jeaneen's car at the home of her new boyfriend and videotaping her car. He then set an alarm for several hours later to wake up in the middle of the night and return to the nearby town to video her car in the same position. He admitted in his testimony that he drove by the boyfriend's apartment building a number of times in order to check on Jeaneen's location.

Moreover, Jeaneen was recognized by the court as the primary caregiver of the children. While James worked two jobs, it was also noted he "was not very involved when he was home."

James and Jeaneen were given joint legal custody of the children, with Jeaneen receiving physical care. James had scheduled parenting time every other weekend and on Wednesdays overnight. He was ordered to pay $449 per month in child support for the three children, based in part on his previous child-support obligation to his ex-wife for their shared child.

In September 2016, Jeaneen filed a petition for modification of child support, claiming the court should modify the obligation because James's salary had increased and because James's child with his wife had turned eighteen and no longer received support.

James resisted Jeaneen's petition to modify child support and filed a counter-petition for change of custodial arrangement, asking the court to award the parties joint physical care of the children.

Both petitions proceeded to trial in September 2017.

At trial, James testified he was now seeking physical care of the children rather than shared or joint care. He cited new information he learned about Jeaneen's fiancé as the reason. James testified that in May, he learned Jeaneen had recently started dating Mitchell Kubik, a registered sex offender. James did not express any concerns to Jeaneen about the children's safety or tell her what he had learned. Instead, he waited until July and then reported to the Iowa Department of Human Services (DHS) that he believed Kubik was being allowed improper contact with his children. He also reported to local police that he believed

Kubik was staying somewhere other than where he was currently registered. A child-abuse assessment followed, with DHS issuing a founded report for Jeaneen's act of allowing access to a registered sex offender. Additionally, Jeaneen was charged with child endangerment (which was still pending at the time of the modification trial), and Kubik was charged with failing to register his address.

The report from the founded assessment was entered into evidence at trial. In it, the social worker found that Jeaneen was open with the worker, admitting that she knew Kubik was a registered sex offender, they were in a romantic relationship, and he had stayed overnight in her home on nights the children were also there. Jeaneen was told by the social worker that Kubik could not be alone with the children and could not stay overnight in the home on the nights they were there; Jeaneen indicated she was previously unaware of the rule but stated she understood it and would follow it in the future. The social worker found "no other indicators" "of abuse or neglect" and found the children to be "without outward signs of abuse or neglect" and to "interact[] in a manner showing no fear and a bond with the mother." The report ultimately concluded the children were safe in their home, and "Jeaneen has the parenting skill and capacity to continue to keep the children from Mitchell Kubik." The family's ongoing social worker—who was different than the worker who authored report—testified at the trial, stating, "[Jeaneen's] been very cooperative. I haven't had issues. She takes any recommendation I would make, and the [family safety, risk, and permanency] worker didn't—has [not had] any concerns about her ability to parent or follow through with recommendations made for her or the kids." The worker also testified

she did not have any concerns that Jeaneen would fail to follow the restriction of not leaving the children otherwise unsupervised with Kubik.

When asked, Jeaneen indicated that Kubik told her was a registered sex offender due a conviction for assault with intent to commit sexual abuse that he received after pleading guilty in 2008. Although no official description of the crime was entered into the record at the modification trial, Jeaneen testified the incident took place when Kubik was nineteen years old and involved a seventeen-year-old girl.

During Jeaneen's testimony, she discussed several incidents when James failed to properly supervise the children. In one instance, James took the three children to a local racetrack for a special race that was well-attended with both local and out-of-state people. At some point, James had the oldest child—who was then eight—take the three-year-old child to the bathroom. James was unable to see the children from where he waited, as was made clear when he could not testify as to which bathroom the eight-year-old took the three-year-old. Jeaneen also attended the races and chanced upon the three-year-old when she was also using the restroom. Additionally, Jeaneen and James testified about the time the children were at James's home and a bookcase fell on the three-year-old because she tried to climb it; the child reported difficulty breathing and had to be taken to the emergency room. In another instance, Jeaneen testified about a video James posted to social media; James used his phone to film images from his outdoor security camera as the oldest child and middle child physically fought over a toy rather than going outside to intervene. Another picture admitted into evidence showed a page from James's social media account in which he uploaded a picture

of the youngest child with an injury to her face that he captioned "[A]t the [ER]. [Middle child] beat her up." According to Jeaneen, there was initially concern that the youngest child had suffered a broken nose as a result of the incident.

In its written ruling, the court denied James's petition to modify the physical-care arrangement, stating:

> In the instant case, [Jeaneen's] engagement to a convicted sex offender concerns the court. Also of concern to the court is [her] wiliness to accept explanations provided by Kubik for his behavior and then to excuse that behavior. Kubik was caught in at least one lie by the DHS investigator. It appears to this court Kubik will say anything to minimize his behaviors and to cast himself in a better light. It appears [Jeaneen] has not yet recognized this type of behavior by Kubik.
> The court finds [Jeaneen's] engagement to a registered sex offender is, in fact, a material and substantial change in circumstances since entry of the original decree, which certainly could not have been contemplated by the court when the decree was entered. The court also finds these circumstances relate to the welfare of the children.
> . . . .
> [Jeaneen] not only provides for the basic needs of the children, she has offered them opportunities to participate in extracurricular activities, at her expense; she has secured additional services to address their needs, including behavior issues. [Jeaneen] demonstrates a better awareness of safety concerns for the children, such as the incident [that] occurred on Memorial Day [at the racetrack].
> As previously noted, there is undisputed evidence in the record of [James's] remark in front of the children regarding their mother only wanting child support and not loving the children. There is no evidence of similar remarks by [Jeaneen] that would damage the children's relationship with [James]. There is evidence in the record of calculating behavior by [James] to establish evidence for a possible contempt; there is no credible evidence of similar behavior by [Jeaneen].
> As previously noted, [the family's ongoing social worker] testified she did not have concerns that [Jeaneen] would allow Kubik around the children. [She] felt that the children were safe with [Jeaneen] and that [Jeaneen] provides an appropriate home. As previously noted, [James], himself, elected not to report Kubik's relationship with [Jeaneen] and presence at the home, until more than a month after discovering Kubik is a registered sex offender. It

appears [James] also expects [Jeaneen] will keep the children safe from Kubik.

The court granted Jeaneen's motion for modification of child support, finding that James's obligation met a statutory criteria for a substantial change in circumstance, as his previous child-support obligation varied "by ten percent or more from the amount which would be due pursuant to the most current child support guidelines." Iowa Code § 598.21C(2)(a) (2016).

James appeals.

## II. Standard of Review.

We review proceedings to modify custodial provisions de novo. *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa 2002).

## III. Discussion.

The requirements to change a custodial provision are well-settled:

> The first question we need to address is whether the record shows there has been a substantial change in circumstances such as is necessary for modification of the custody provisions of a paternity decree. Courts are empowered to modify the custodial terms of a paternity decree only when there has been a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of the child.

*Id.*

Even if the petitioning parent proves a substantial change in circumstances, the parent must still establish that he or she "has an ability to minister more effectively to the well-being of the parties' children" in order for a modification to be made. *In re Marriage of Thielges*, 623 N.W.2d 232, 238 (Iowa Ct. App. 2000); *see also In re Marriage of Mayfield*, 577 N.W.2d 872, 874 (Iowa Ct. App. 1998) (noting the father had shown a substantial change of circumstances, so "[t]he question

becomes whether he showed he can render superior care"). "The parent seeking to change the physical care has a heavy burden and must show the ability to offer superior care." *Mayfield*, 577 N.W.2d at 873. This "heavy burden 'stems from the principle that once custody of children has been fixed it should be disturbed only for the most cogent of reasons.'" *Thielges*, 623 N.W.2d at 235 (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)). The requirements are the same for unmarried parents as they are for once-married parents. *See, e.g.*, *Carmichael v. Philpott*, No. 17-0124, 2018 WL 739275 (Iowa Ct. App. Feb. 7, 2018); *German v. Metcalf,* No. 09-1470, 2010 WL 1875640, at *1 (Iowa Ct. App. May 12, 2010).

Here, the district court determined James met the first part of his burden; concluding Jeaneen's choice to become engaged to a registered sex offender whom she allowed to be around the children before DHS's intervention and which ultimately resulted in a founded child abuse report and a charge for child endangerment met the standard of a substantial change. No one challenges this part of the district court's determination,[1] and we agree with the district court.

Next, we must consider whether James met his heavy burden of establishing that he can provide the children care superior to that provided by Jeaneen. At trial, James expended less effort focusing on his strengths as a parent and more time trying to paint Jeaneen in a negative light. His argument on appeal is similar, claiming that because Jeaneen has chosen to become engaged to

---

[1] Jeaneen did not file an appellate brief, *see* Iowa R. App. P. 6.901(1)(b), and we would not expect James to challenge this.

someone on the sex offender registry and has uncharged instances of possibly applying for a credit card in a boyfriend's name, she cannot be a good mother.

Like the district court, we are not unconcerned by Jeaneen's chosen paramour. But the evidence at trial was that Jeaneen could and was prepared to keep the children from being with Kubik unsupervised. DHS determined the children were safe in Jeaneen's home, and the social worker who testified indicated she believed Jeaneen would keep them that way. And as the district court noted, James's delay of more than one month in reporting that Kubik was staying in the home with his children seems to establish that James trusts Jeaneen to keep the children safe as well. Additionally, while James asks us to focus on Jeaneen's possible past criminal activities—she was never criminally charged for any false credit card applications and we do not believe the evidence at trial established she engaged in such actions—James ignores his own past convictions for assaulting his ex-wife and for going armed with a knife.

Jeaneen has always been the primary caretaker of the children. She makes sure the children receive the medical care they need, including reaching out and securing behavioral services for the oldest child, who has had some outbursts of anger and dishonesty. She also makes sure the children are engaged in extracurricular activities in the community, including Boy Scouts, wrestling, and dance. She does not appear to have trouble supervising the three young children, whereas James appears to give the children more freedom than they are yet prepared to handle. While James appears to have a strong support system in his parents, who have played a role in helping to care for the children, Jeaneen also

has a strong support system in her mother. Both sets of grandparents live nearby and help out with child care and transportation.

We understand James's concern regarding Jeaneen's fiancé, but under these circumstances, we cannot say James established that he can provide the children superior care.

We affirm the district court's denial of James's petition to modify the physical-care arrangement.[2]

**AFFIRMED.**

---

[2] In passing, James also mentions in his appellate brief that "[c]hild support should be set according to the financial information submitted by the parties." As he has provided no argument regarding alleged legal error by the district court regarding the modified child-support obligation, we understand this to mean that we need only consider James's child support obligation if we disagree with the district court's denial of his petition to modify the physical-care arrangement. Because we agree with the district court's determination, we do not reconsider James's child-support obligation.